# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00365-COA

| | |
|---|---|
| IN THE MATTER OF THE ESTATE OF WALTER GREEN, DECEASED: THE ESTATE OF DOUGLAS W. GREEN, DECEASED, BY EMILY ROSE GREEN, ADMINISTRATOR | APPELLANT/ CROSS-APPELLEE |

v.

| | |
|---|---|
| ANGELA GREEN MICHINI | APPELLEE/ CROSS-APPELLANT |

DATE OF JUDGMENT:                              12/10/2021
TRIAL JUDGE:                                        HON. JAYE A. BRADLEY
COURT FROM WHICH APPEALED:       GEORGE COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:              A. MALCOLM N. MURPHY
ATTORNEY FOR APPELLEE:                SCOTT CORLEW
NATURE OF THE CASE:                      CIVIL - WILLS, TRUSTS, AND ESTATES
DISPOSITION:                                    ON DIRECT APPEAL: AFFIRMED.  ON
                                                        CROSS-APPEAL: AFFIRMED - 03/12/2024
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., GREENLEE AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     Walter Green passed away in 2010, and within the week, his son sought probate of his will.  It was only two pages long and directed specific devises to each of his three children.  But after it was submitted to probate, his daughter came forth with a different will.  For nine years now, the issue of which will would control has been settled, but the aftermath of that decision has brought about other disputes.

¶2.     We find no reversible error in the trial court's decisions to order the return of life insurance proceeds to the estate, to deny interest in addition to the amount of life insurance

proceeds, to set the amount of fees for the estate's attorney, or to deny the return of money taken from a joint account, and we affirm.

## BACKGROUND

¶3.     These facts are no longer in dispute.  After Walter Green died, his children Douglas and Angela began a long conflict over their father's estate.  Douglas had a document from 2004 he claimed was his father's real last will and testament; Angela had one from 2010. The former appointed both son and daughter as executors, left Douglas "all cars, trucks, tractors, or farm-related equipment," and split the real and personal property between them. The latter cut Douglas out completely, primarily benefitting Angela.[1]  The children also fought over whether money had been wrongfully taken from their father during his lifetime or after his passing.

¶4.     Douglas argued Angela had unduly influenced their father to cut him out of the 2010 will and that as a result, it should be excluded.  Their sister Carmen claimed both the 2004 and 2010 wills were the product of undue influence.

¶5.     The stakes were high: Walter's estate owned nearly 1,000 acres of land and a nearly 4,000 square-foot home, with a combined value assessed in 2011 at $3.5 million (or $4.75 million in 2023).

***The second will is rejected, and the first will is admitted to probate.***

¶6.     In 2012, after a three-day trial, the Chancery Court of George County rendered a final

---

[1] Both wills contained provisions for a third child, Carmen, with the same devise: "the sum of $10,000.00 and all my love and affection," plus $10,000 more "five years from the date of my death."

decision on the will dispute. The trial court recounted Walter's many medical challenges, which included problems in cognitive function to the point he forgot familiar people and places and required supervision. Both children had provided care for their father during this time, but in the patch of time when the 2010 will was created, Douglas was hospitalized. The trial court found that while Douglas was in the hospital, "several events took place all of which benefitted Angela."

¶7. Notably, Angela took her father to an attorney to craft a new will—without an appointment. The attorney was so concerned he suggested Walter first should be checked by a medical professional to determine if he was competent. Although the doctor said Walter was competent, it appeared Angela was in charge.

¶8. Second, "Angela changed Walter's life insurance policy to reflect herself as the sole beneficiary" and had related "forms mailed to her address so that Doug[las] would not know about it." She emphasized to the insurer to remove her brother from the policy.

¶9. Last, there was an unusual situation where Angela tried to have her father and Douglas sign over an annuity to her at a bank in Hattiesburg, but "Bank officials saw warning signs and were uncomfortable with the scenario that they were caught in." The ruse was unsuccessful.

¶10. The trial court found that all seven factors were present to establish a confidential relationship between Walter and his children. Yet for the period Douglas was hospitalized, the trial court reckoned Angela had "put into motion" a scheme to completely cut her brother out—in "an attempt . . . to scurry around almost in an almost panicked state." And so a

3

presumption of undue influence arose as a result of Angela's confidential relationship with Walter. Finding that Angela failed to rebut that presumption, the trial court declared the 2010 will a product of undue influence: "nothing more than a reflection of the wishes and desires of Angela with respect to the distribution of her father's estate."

¶11. In 2014, the trial court took up the contest over the 2004 will. At the time that will was created, Walter still ran his own business and drove himself, and he was in good mental and physical shape. There were none of the suspicious hallmarks of the 2010 will in the 2004 will, and even though Douglas and Angela had a confidential relationship, the trial court found no evidence of undue influence; the court found the 2004 will was truly Walter's testament. Therefore it was admitted to probate.

### *The aftermath of the will dispute.*

¶12. Probating the will did not resolve all the disputes between Walter's children. Douglas counterclaimed that Angela had used her undue influence over their father to usurp the insurance policies detailed above, which totaled roughly $106,000. Douglas also claimed that Angela had raided a joint account held by the trio, benefitting her by about $15,500. His attorney also sought attorney's fees from the father's estate for the effort expended in successfully turning back the probate of the 2010 document that had cut Douglas out of the will.[2]

¶13. The trial court held that Angela's change of beneficiary in the insurance policies, like

---

[2] In 2018, Douglas passed away, and his estate was substituted as a party. His daughter Emily Rose Green serves as administratrix of the estate. We refer to Douglas and his estate interchangeably.

the 2010 will, had been the product of her undue influence over her father. Angela's actions in removing Douglas from the policies—down to hand-writing, "Please Remove Douglas Wolf Green as a Beneficiary," at the top of the change of beneficiary form—were found to be wrongful. The trial court found she did not rebut the presumption of undue influence, and so it ordered the return of the benefits "to Walter's estate by tendering same to the estate administrator . . . who shall deposit same into the estate bank account." While the trial court ordered the return of the benefits, it declined to order interest on this amount.

¶14. But Angela prevailed in her defense to halt the return of money taken from the joint account. The trial court adhered to the general rule that joint property belongs to each of the holders, and they are "allowed to treat the joint property as if it were entirely [their] own." Accordingly, the counterclaim was denied on this point.

¶15. The claim by Douglas for his father's estate to pay the executor's attorney's fees likewise faltered. The lawyer had "prepared a *McKee* Affidavit and itemized statement for time and expenses" for the two years of the contest over the first will, which spanned 2010 through 2012, during which time Douglas also had served as executor of his father's estate. The request was for "payment of his fees and expenses in excess of $93,000.00 from Walter's estate."

¶16. The trial court recounted how statute allowed the payment of reasonable sums paid to manage an estate or represent it, but found that some of the "charges for time spent in preparation for the first will contest . . . went solely to benefit Doug[las]" and not the estate of his father. The trial court also found it vague and lacking detail regarding alleged cash

payments and expenses. Crucially, the trial court found that the request for fees "seems to reflect an extraordinary amount for the relatively short period of time served as the executor's attorney."

¶17. Ultimately, the trial court found that the fee request "seems excessive" and found "that the fees incurred were for the benefit of an individual, Douglas"—and not Walter's estate. It therefore completely denied the request for fees and ruled that "[t]he responsibility for payment of these fees should be addressed in Doug's estate."

¶18. The Estate of Douglas filed a motion to reconsider, arguing why the efforts by the attorney on behalf of Douglas were actually in service of the estate of his father. After a hearing, the trial court relented, ruling it would "grant that portion of attorney's fees that directly relate to the administration of Walter Verland Green, but not those fees that are vague, nor those for 'cash,' nor those which appear to be related to the contest of the Will of Walter"—and therefore which benefitted Douglas exclusively. The trial court made a finding that 16.75 hours of work was proper, or the equivalent of $4,187.50 at the lawyer's hourly rate of $250. An expense of $148.08 for running the notice in the *George County Times* was also allowed.

## STANDARD OF REVIEW

¶19. "We will not disturb the factual findings of a chancellor unless such findings are manifestly wrong or clearly erroneous." *In re Est. of Ladner*, 911 So. 2d 673, 674 (¶8) (Miss. Ct. App. 2005). "Whenever there is substantial evidence in the record to support the chancellor's findings of fact, those findings must be affirmed." *Id*. at 675 (¶8). On the other

hand, "[i]n matters that are questions of law, this Court employs a de novo standard of review and will only reverse for an erroneous interpretation or application of the law." *Id*.

> **I.      The argument that interest should have been awarded on the return of insurance proceeds is procedurally barred.**

¶20.    The Estate of Douglas contends it should have been awarded interest on the return of the insurance benefits.

¶21.    On appeal, Douglas presents a detailed argument why interest should be awarded, citing the statute and precedent. *See* Miss. Code Ann. § 75-17-7 (Rev. 2016) ("All other judgments or decrees shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint"); *Brand v. Brand*, 482 So. 2d 236, 238 (Miss. 1986) ("The use of one's money by another has value in economic theory and in fact . . . . In our society this use frequently is compensated by the charging of interest"). The Estate of Douglas now argues this statute and precedent require the imposition of interest.

¶22.    Yet this statute and related cases were not argued below. In his Motion to Reconsider Order Ruling on Counterclaim, Douglas devoted only three sentences to why interest should be awarded. Without citation to statute or precedent, he argued the return of the policies should be accompanied with a "rate of interest . . . fixed by this Court at 8% per annum from [the] date of the wrongful conversion." During argument before the trial court on the motion, counsel for Douglas likewise did not present statute or precedent warranting a grant of interest on the return of the policies, despite noting that he had a case. In the trial court's ruling, it found that it "can find no authority for an award of interest in this matter."

7

¶23. It is a well-settled rule that "a trial judge will not be found in error on a matter not presented to the trial court for a decision." *Taylor v. State*, 330 So. 3d 758, 769 (¶26) (Miss. 2021); *Black v. State*, 919 So. 2d 1017, 1019 (¶6) (Miss. Ct. App. 2005) ("We will not put a trial judge in error on a matter not presented to him for decision"); *Brooks v. Sanders*, 243 Miss. 46, 49, 137 So. 2d 174, 175 (1962) (Absent a motion preserving a claim of error "we have no ruling of the trial court for review on that particular point").

¶24. Accordingly, we find this argument procedurally barred on appeal. We affirm the trial court's order declining to award interest when no statute or precedent was argued below to warrant such an award.

**II. The award of attorney's fees was within the trial court's discretion.**

¶25. The Estate of Douglas also argues that it was error for the trial court to limit payment by Walter's estate of its attorney's fee to around $4,000, when his fee request was for about $93,000. On appeal, he's claiming that all of the "actions were to the benefit of the Estate of Walter and the other parties," arguing "Angela stole all of a $3,500,000.00 Estate from her mentally diminished father at a time when he had no cognitive mental function."

¶26. State law provides that "[i]n annual and final settlements, the executor, administrator, or guardian shall be entitled to credit for such reasonable sums as he may have paid for the services of an attorney in the management *or in behalf of the estate*, if the court be of the opinion that the services were proper and rendered in good faith." Miss. Code Ann. § 91-7-281 (Rev. 2004) (emphasis added). Based on this statute, the Supreme Court has held that "Attorney's fees and administratrix fees are allowable by the chancellor and normally

8

are within that judge's discretion." *In re Est. of Philyaw*, 514 So. 2d 1232, 1237 (Miss. 1987).

¶27. Yet the Court made clear that the discretion to award a fee is not unlimited. *Id*. "However, we have stated that attorney's fees were unauthorized where the services were rendered *for the sole benefit of an individual interested in the estate*, as against the others interested." *Id*. (emphasis added). By analogy, the Supreme Court reasoned to allow this would be to allow "some successful adversaries [to force the losing party] to pay the attorney's fees incurred by it in bringing about their defeat," and therefore "in the nature of punitive damages, which is not allowable in a litigation of this character." *Id*. (cleaned up).

¶28. As this Court has held, "[a]lthough attorney's fees are the personal obligation of the administrator or executor, *where they have benefitted the estate*, they may be paid out of the estate as administration expenses." *Est. of Collins v. Collins*, 742 So. 2d 147, 149 (¶6) (Miss. Ct. App. 1999) (emphasis added). "But, where the estate has not benefitted by those services, *equity suggests that the estate should not pay for those services*." *Id*. (emphasis added).

¶29. Relying on these well-established rules, the trial court refused to allow most of the charges claimed by the attorney. After review, we find no basis to second guess these factual findings by the trial court. The situation was binary: the 2010 will Angela sought to probate benefitted her alone and cut Douglas out completely; the 2004 will Douglas sought to probate benefitted them both equally. Both wills treated the other daughter the same—she received a total of $20,000. So any effort to combat Angela's attempted probate of the 2010 will came

9

to the exclusive financial benefit of Douglas. Which will was probated did not have a meaningful impact on Walter's estate.

¶30. Accordingly, the successful fight by Douglas to exclude the 2010 will and probate the 2004 will was not to the benefit of *Walter's estate*; it only benefitted Douglas, as it restored him to a 50% share under the terms of the 2004 will. Under *Philyaw*, since the legal work did not benefit Walter's estate, but only a single interested beneficiary, it was within the trial court's discretion to refuse to require the estate to pay the attorney's fee for those services.

¶31. Our precedent is clear that in such a situation, the trial court is within its authority to deny the request for attorney's fees where the estate has not benefitted from those services and when equity would foreclose recovery of such a fee. And Douglas does not cite or analyze *Philyaw* or the rule relied upon by the trial court in denying the request for the fee.

¶32. In addition to the factual finding made by the trial court that nearly all the attorney's actions benefitted Douglas alone (and not his father's estate) was a related factual finding that the timesheet submitted by the lawyer was "vague," including entries requesting reimbursement "for which there is no invoice or proof of payment," and no clarity from the entries "that the expenses benefitted the probate of Walter Verland Green's estate."

¶33. The trial court was within its discretion to characterize the attorney's time sheet as "vague." Most entries are nearly bare of detail, containing a date and an all-caps title like "WITNESS ATTY PROFILE." That particular entry carried a time entry of one hour. Yet that was all the information included. Similarly, one entry contained a date range of "2010-2011," apparently meaning all dates within both years, and a time entry of 15.25 hours for

10

what was only captioned "CORRESPONDENCE RECEIVED FROM KINNARD [sic]," the name of Angela's first attorney. It was within the discretion of the trial court to determine if Walter's estate should pay for the demand for $3,812.50 for reviewing correspondence in the will dispute.

¶34. It was the trial court's duty to assess the reasonableness of such a claim, especially when our statutes, precedent, and rules place the burden of showing this reasonableness on the attorney claiming the fee. The record does not contain information showing this to be reversible error.

¶35. Nor is the claim for fees impacted simply because Walter's home and real property were worth a large amount of money. "Fees for fiduciaries and attorneys shall not be based on the value of any real property." UCCR 6.11. Instead, fees are governed by the familiar factors including "time, skill, the responsibility, the monetary value of the estate administered and its liquidity, the speedy disposition of the business, the services of the attorney, the practice of attorneys in that court and the charging of fees for similar services, the complexity of the issues, and the necessity of litigation concerning the estate business." *Collins*, 742 So. 2d at 149.

¶36. Finding that the trial court was within its discretion in setting the attorney's fees, we affirm.

### III. The trial court did not abuse its discretion in declining to order the return of funds to the joint account.

¶37. The Estate of Douglas appeals the trial court's denial of his request to order Angela to return about $15,000 from a joint account held by him, his father, and Angela. He argues

that she "withdrew all the money shortly after Walter died," and the undue influence she exhibited elsewhere should require the return of the money to Walter's estate.

¶38.   The trial court carefully considered the record in this case as well as the applicable law, applying a recent decision from this Court.  "When an account is held jointly in the name of one depositor or another, each depositor is allowed to treat joint property as if it were entirely his own." *Est. of Brown v. Brown*, 293 So. 3d 851, 856 (¶12) (Miss. Ct. App. 2019) (internal quotation marks omitted).

¶39.   Per this rule, the trial court reasoned "that upon Walter's death the joint accounts passed outside his estate to the other joint owners, i.e., Angela and Doug."  The trial court determined, "These funds would belong to Angela and Doug jointly."  So while *Walter's* estate would not have a claim to the jointly held money, the trial court determined that "[i]f Doug's estate wishes to pursue a claim against Angela," it certainly could.  *See Id.* ("That presumption of [joint] ownership may be overcome upon proof of forgery, fraud, duress, or an unrebutted presumption of undue influence").

¶40.   We find this ruling was within the trial court's discretion and complied with our precedent.

### IV.    The cross-appeal is procedurally barred.

¶41.   Angela's cross-appeal fails because it does not provide legal support for reversal. Her statement of the issues includes the argument that the trial court "erred in awarding the insurance proceeds to the estate as the insurance proceeds passed out of the estate and the estate claim for insurance proceeds was barred by the statute of limitations."

¶42. The cross-appeal, while not designated as such beyond the face of her brief, spans two pages. But in those two pages Angela does not cite any rule, statute, or precedent in support of her argument the insurance policies should not have been returned to Walter's estate.

¶43. This does not conform to our rules. *See* MRAP 28(a)(7) ("The argument shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on"); *Reading v. Reading*, 350 So. 3d 1195, 1199 (¶19) (Miss. Ct. App. 2022) (holding that conformity with the rules "does not simply require a party to mention authority; the authority must be used to **develop the argument in a meaningful way**" (emphasis in original)). Because Angela's cross-appeal does not conform to Rule 28(a)(7), it is procedurally barred.

¶44. In any event, Angela only generally protests that the insurance benefits should not be returned to her father's estate, but fails to establish an alternative entity to receive the funds for re-disbursement. And she did not appeal the core ruling that her undue influence over her father was calculated to deprive her brother Douglas of his share of the insurance benefits, the effect being that the insurance policies were wrongfully converted by Angela to her full benefit, and with the exclusion of her brother Douglas. Ordering their return to Walter's estate simply puts the parties back into the position they were in prior to Angela's undue influence over the beneficiary change. As the lawyer for the Estate of Douglas argued below, "Equity would demand that."

## CONCLUSION

¶45. For the reasons above, the decisions of the trial court are **AFFIRMED**.

13

¶46.    **ON DIRECT APPEAL: AFFIRMED.  ON CROSS-APPEAL: AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**